IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES FIRE INSURANCE
COMPANY,

        Plaintiff,

        v.

KELMAN BOTTLES, KELMAN GLASS,
LLC,

        Defendants/Third-Party
        Plaintiffs,

        v.

CONTINENTAL CASUALTY COMPANY,

        Third-Party Defendant.

11cv0891

**ELECTRONICALLY FILED**

**MEMORANDUM AND OPINION**

This is a declaratory judgment action brought by Plaintiff, United States Fire Insurance

Company ("U.S. Fire"), seeking a declaration that it does not have to provide  insurance

coverage to the Defendants, Kelman Bottles and Kelman Glass, LLC ("Kelman").  See doc.

no. 1.  Kelman filed counterclaims against U.S. Fire seeking damages for breach of contract

and for bad faith.  See doc. no. 10.  Kelman also sued third-party Defendant Continental

Casualty Company ("Continental") for breach of contract.  See doc. no 29.

Presently before the Court are the parties' Cross-Motions for Summary Judgment.

Continental filed a Motion for Summary Judgment against Kelman.  See doc no. 91.  U.S. Fire

also filed a Motion for Summary Judgment against Kelman.  See doc. no. 93.  Kelman filed a

Partial Motion for Summary Judgment against Continental (see doc. no. 98) and a Partial

Motion for Summary Judgment against U.S. Fire.  See doc. no. 103.

Each party filed a Response to the Motion(s) for Summary Judgment that was/were filed against each of them.  See doc. nos. 107, 110, 114-115, and 116-117.

U.S. Fire also filed a Cross-Motion for Summary Judgment (doc. no. 112) and brief in support.  Doc. no. 113.  Although Kelman filed a Motion seeking time to respond to U.S. Fire's Cross-Motion (doc. no. 122) and this Court granted Kelman's Motion (doc. no. 123),  no response was filed.  However, Kelman filed a Reply Brief re Motion for Partial Summary Judgment Against U.S. Fire (doc. no. 131) and U.S. Fire filed a Reply Brief in support of its Original Motion for Summary Judgment (doc. no. 93).  Doc. no. 127.

The Court has carefully considered all of the aforementioned submissions as well as the Statements of Material Facts (and Responses thereto) and finds that these Motions are now ripe for disposition.  For the reasons that follow, this Court will grant U.S. Fire's Motion for Summary Judgment, will grant Continental's Motion for Summary Judgment, will deny Kelman's Motion for Partial Summary Judgment against U.S. Fire, and will deny Kelman's Motion for Partial Summary Judgment against Continental.  Finally, the Court will deny U.S. Fire's Cross-Motion for Summary Judgment (doc. no. 122) as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed and material.

### A. The Incident and the Furnace

Kelman operates a glass manufacturing facility in Glenshaw, Pennsylvania, where it produces glass containers for the food industry.  Doc. nos. 1 and 10 at ¶¶ 8-9.  The facility contains several furnaces for melting glass.  Doc. nos. 1 and 10 at ¶ 11.  From 2007 to March 15, 2011, Kelman operated only one furnace at the facility.  Doc. no. 121 at ¶ 6.

On March 15, 2011, molten glass escaped from "furnace no. 2" or "kiln #2" (hereinafter "the furnace") which resulted in physical damage to the furnace and other property.  Doc. nos. 1 and 21 at ¶ 21 and doc. nos. 29 and 44 at ¶ 1.

The following is a summary of the relevant history of the furnace.  The furnace had undergone "a rebuild" from December of 2003 through January of 2004.  Doc. no. 108 at ¶ 18.  A rebuild occurred approximately every nine years.  *Id*.  Between January of 2007 and March 15, 2011, the furnace leaked molten glass.  Doc. No. 1 at ¶ 19.  Specifically in April of 2009, the furnace leaked molten glass.  Doc. no. 116 at ¶ 15.  On June 4, 2010 the furnace leaked again.  Doc. no. 116 at ¶ 29.

Following the April of 2009 leak, Doug Hilliard (Kelman's Furnace Manager) sent an email dated April 15, 2009 to William Kelman stating, in pertinent part, as follows:

> As per your question on how long [the furnace] will last … Well as I told you no one can tell you that answer with any certainty.  I am in here this morning at 12:30 am because of a leak on the Northside of the melter.  We have it stopped but it is in a very serious spot in the furnace.  It is about halfway down the block meaning there is a lot of pressure pushing the glass out. I have water and compressed air on it as of now but will have to chip it back and see what we have in the morning.  If it were not for the quick thinking and action of my crew this could have gotten out of hand very easily and we could have lost well over half of the glass in the furnace into the basement. . . .

Doc. no.  97-7.

After the April 2009 leak, Glass Furnace Management, LLC ("GFM") conducted a "Hot Repair Scope Evaluation" at Kelman.  Doc. no. 97-8.  Under the "Repairs Needed" section of its written report, GFM indicated that Kelman needed to make the following repairs: (1) replace the Left Front Checker; (2) "[o]vercoat 5 Sidewall Blocks 100% on Left Side of Furnace[;]" (3) "[o]vercoat the entire front wall metal line[;]" (4) "[o]vercoat 1 [e]lectrode

block on the left side of ther furnace 100%[;]" (5) "[o]vercoat three sidewall blocks along metal line of [r]ight side of furnace." *Id.*

Under the "Repair Options" section of GFM's written report, GFM indicated that the "[o]vercoat work [items 2 though 5 immediately above] should be completed conventionally. . . . [L]owest risk option is to replace 100% of the checker pack including both settings including the rider arches, rider tiles, and transition course with HPC setting as previously installed." *Id.*

Under the "Recommendations" section of its report, GFM stated that if Kelman "desires to run the furnace longer than 2 years, then I would propose 100% replacement of the checker pack and rider arches in both settings." *Id.*

In early May of 2009, GFM sent several quotes to Doug Hilliard at Kelman for the recommended work.  See doc. nos. 97-9, 97-10, 97-11.  On May 15, 2009, Doug Hilliard sent an email to William Kelman (and others) regarding the cost of the work proposed by GFM.  In the body of the email he wrote (in pertinent part) as follows:

> At this time the known fact is the north regenerator front two zones have collapsed.  This is causing a blockage of the combustion air coming in and the exhaust going out in these two ports. This in turn limits the daily tonnage . . . . cutting deeply in to the potential profit . . . .
> The furnace inspection also showed that we are in direr [sic] need of overcoat block on mainly the north side of the melter.  There is a great potential for us to get a dangerous glass leak that may or may not be stopped in this area.
> My recommendation is that we replace the whole north checker pack and overcoat the side walls at the same time.  This will be the most cost effective, least amount of down time and reliable way to do this repair.  We do run a risk of the south failing under this extreme thermal shock of firing them continually during the repair, but I feel that is a risk we must take at this time. . . .
> What I need is some guidance on which way to proceed with this.  The most economical and fastest way of doing it would be to only replace the front part that has collapsed. . . . I do not recommend this type of repair but if it is all we can afford at this time then that is what we will have to deal with. . . .

4

Doc. no. 97-12.

Although Kelman ultimately replaced the checker pack in the north regenerator of the furnace sometime between December of 2009 and February of 2010, it only repaired the south side checker pack and regenerator during this same time frame.  See doc. no. 101-3 at pp. 35-38.  Kelman stated that it overcoated the entire metal line, not just portions of it, but admitted that it did <u>not</u> do some of the "other work" GFM recommended.  Doc. no. 121 at ¶ 24.  Kelman explained that it did not do some of the "other work" recommended by GFM because "it was not done in the industry, had never been done at the [f]acility and it could cause the block to wear out faster than it would without the work."  *Id.*

Following the June 4, 2010 leak (which appears to have been two leaks, close in time on the same date), on June 4, 2010, Doug Hilliard wrote an email to Eleni Sotiriou (a Kelman employee), which stated in pertinent part:

> The furnace is ok right now.   We did have another leak, a fairly bad one, after I had talked to Bill.  I was already here and was able to stop it fairly quickly.  We are now in the process of cleaning both areas where the leaks occurred up and getting more air to them.

Doc. no.  97-17.   On February 2, 2011, Doug Hilliard wrote the following in an email to Eleni Sotiriou:

> As for how worried we should be, I think we should be extremely worried.  In my opinion if this block falls into the throat and causes a blockage, we will have no other option than shutting the furnace down, draining it and do a full repair on the whole melting end. I do not feel that this furnace will take a drain, cool down, minor repair and restart.

Doc. no. 97-18.  On February 6, 2011 Doug Hilliard again emailed Eleni Sotiriou, stating:

> We have had some movement in the blocks on the front wall overnight.
> The block to the left, or to the north side of the wall, has remained stable, but
> the block on the right, or the south side has shown some additional slippage.
> The crack in the bridge-wall above this area seems to have become more
> prominent.
> . . . Although we have had some slight movement I am confident we will
> be ok until tomorrows [sic] repair.  I have my tank attendants watching it
> closely on reversals and they are to contact me as soon as they see any change.

Doc. no. 97-20.

On March 15, 2011, molten glass leaked from one, if not two, locations on the north

wall.  Doc. no. 116 at ¶ 24.

Kelman had a written procedure in place to manage potential leaks from the furnace.

Doc. no. 121 at ¶ 14.  U.S. Fire's and Continental's expert conceded that glass plants typically

have contingency plans in place to manage furnace leaks.  *Id.* and doc. no. 108 at ¶ 23.

**B. The Insurance Policies**

U.S. Fire issued a commercial property insurance policy to "Kelman Bottles LLC" (the

named insured set forth on the declarations page of the policy), and listed "Kelman Glass

LLC" as an additional named insured pursuant to an endorsement.  Doc. nos. 1 and 10 at ¶ 7,

doc. no. 1-4, and doc. no. 121 ¶ 37.  The policy declarations page indicates that the policy

period ran from March 10, 2011 to March 10, 2012.  Doc. no. 1-4.

Continental also issued an insurance policy to Kelman Glass LLC.  Doc. no 97-1 at

bates no. 02776.   The declarations page of the policy indicates that the policy period ran from

March 14, 2011 to March 14, 2012.  *Id.*  Continental's policy provides coverage for

"equipment breakdown" as that term is defined by the policy.  *Id.*

No party contests that Kelman provided timely notice of the March 15, 2011 event to

its two insurers.

On June 14, 2011, Continental denied Kelman coverage for the claim arising out of the

March 15, 2011 event indicating that no "breakdown" (as the policy defines that term)

occurred.  Doc. no. 29-1, ex. "B."  On June 30, 2011, U.S. Fire denied Kelman coverage for

the claim arising out of March 15, 2011 event based on the policy's:  (1) inherent vice

exclusion, (2) wear and tear exclusion, and (3) design defect exclusion.  Doc. no. 121 at ¶ 60.

### C. Procedural History

On July 6, 2011, U.S. Fire filed the instant declaratory judgment action seeking a

judgment declaring that "the furnace is not 'Covered Property'" as defined by the U.S. Fire

policy.  Doc. no. 1.

On August 23, 2011, in response to U.S. Fire's Complaint, Kelman filed an Answer and

Counterclaims asserting claims for breach of contract and bad faith.  Doc. no. 10.   U.S. Fire

moved to dismiss Kelman's Counterclaims, which this Court denied.  Doc. no. 23 and text

order dated September 13, 2011.  U.S. Fire filed an Answer to Kelman's Counterclaims on

September 26, 2011.

On October 10, 2011, Kelman filed a Joinder Complaint against Continental asserting a

claim for breach of contract.  Doc. no. 29.  After Continental was joined, U.S. Fire amended its

Answer to Kelman's Counterclaims to assert an additional affirmative defense.  Doc. no. 43.

The additional affirmative defense referenced the portion of its own policy which excluded

coverage for any property covered by another insurance policy, except for any excess amount

due (whether collectible or not) from the other insurance policy.  *Id.*

On November 30, 2011, Continental filed an Answer to Kelman's Joinder Complaint.

Doc. no. 44.

Following the close of discovery, Kelman sought to amend its Third Party Complaint against Continental to assert a claim for bad faith.  Doc. no 77.  On  March 1, 2012, the Court denied Kelman's Motion to amend its Third Party Complaint.  Doc. no. 90.

As noted above, Continental filed a Motion for Summary Judgment against Kelman. See doc no. 91.  U.S. Fire also filed a Motion for Summary Judgment against Kelman.  See doc. no. 93.  Kelman filed Partial Motions for Summary Judgment against Continental (see doc. no. 98) and U.S. Fire.  See doc. no. 103.

In addition to filing Cross-Motions, the parties also filed Responsive Briefs to one another's Motions.  Continental filed a Response to Kelman's Motion for Partial Summary Judgment (doc. no. 107), and U.S. Fire filed a Response to Kelman's Motion for Partial Judgment.  Doc. no. 110.  Kelman filed a Response to Continental's Motion for Summary Judgment (doc. nos.  114-115), and it also filed a Response to U.S. Fire's Motion for Summary Judgment (doc. nos. 116-117).

In addition, U.S. Fire filed (with the Court's permission) a Reply to Kelman's Response to U.S. Fire's Motion for Summary Judgment.  Doc. no. 127.

Finally, Kelman filed a "Cross-Motion for Summary Judgment" and a Brief in Support of same.  See doc. nos. 112-113.  Kelman filed a Response to the same.  Doc. no. 131.

Thus, the procedural posture is one of Cross-Motions for Summary Judgment in which there appears to be no dispute as to any material fact.  Thus, as discussed below, the only issues before the Court are purely legal ones which may be decided upon Motion.

## II. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2).

When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party. Fed. R. Civ. P. 56(e)(2).

To demonstrate entitlement to summary judgment, the defendant, as the moving party, is not required to refute the essential elements of the plaintiff's cause of action. The defendant needs only point out the absence or insufficiency of the plaintiff's evidence offered in support of those essential elements. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Once that burden has been met, the plaintiff must identify affirmative evidence of record that supports each essential element of his cause of action. If the plaintiff fails to provide such evidence, then he is not entitled to a trial, and defendants are entitled to summary judgment as a matter of law. *Id*.

In summary, the inquiry under Rule 56 is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must

prevail as a matter of law.  It is on this standard that the Court has reviewed each of the Cross-Motions and Responses thereto.

## III. DISCUSSION

### A.  Kelman's Breach of Contract Claims against Continental and U.S. Fire

The legal principles governing this Court's interpretation of the two insurance policies at issue, are well settled.  Under Pennsylvania law,[1] the "'interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court.'"  *Gardner v. State Farm Fire and Cas. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)).  Since an insurance policy is a contract, the Court's duty is to ascertain the intent of the parties as manifested in the language of the agreement.  *Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1075 (3d Cir. 1980).  A policy must be read as a whole and its meaning construed according to its plain language.  *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011).

Whether an ambiguity exists is a question of law.  *Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 419 (3d Cir. 2011).  The Court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits, and should not torture the language of the policy to create an ambiguity.  *Id.*  Under Pennsylvania law, an insurance contract is ambiguous where it: "(1) is reasonably susceptible to different constructions, (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning."  *Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 163 (3d Cir. 2002).

---

[1] Pennsylvania law applies to this diversity action.

When policy language is clear and unambiguous, the Court is required to enforce that language. *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999), citing *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). When the policy language is ambiguous it must be construed against the insurer and in favor of the insured, and any reasonable interpretation offered by the insured must control. *American Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011).

Finally, the last-antecedent rule provides "that qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and not to others more remote." *Stepnowski v. C.I.R.*, 456 F.3d 320, 324 (3d Cir.2006) (quoting *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir.2003)). In other words, if a sentence reads "A or B with respect to C," it should be interpreted as containing two items: (1) "A" and (2) "B with respect to C." *Id*. at 324 n. 7. However, the last-antecedent rule "is not an absolute and can assuredly be overcome by other indicia of meaning." *Pilosi*, 393 F.3d at 365.

### 1. Continental's Motion for Summary Judgment and Kelman's Motion for Partial Summary Judgment as to Continental

Kelman's Joinder Complaint alleges that by denying insurance coverage, Continental breached its contract with Kelman. Although Continental admits that it denied coverage, it also denies that it breached its contract with Kelman.

In support of its argument that summary judgment should be entered in its favor, Continental primarily argues that "the leak," which Kelman sustained on March 15, 2011, was not "sudden and accidental" and therefore was not a "breakdown" as defined by the insurance policy. In support of this contention, Continental points to the prior leaks Kelman endured between April of 2009 and June 4, 2010. Continental seeks a declaration that the loss

sustained by Kelman was not "sudden and accidental" as defined by Continental's policy and thus, Continental is not required to provide insurance coverage.[2]

Kelman, in its Motion for Partial Summary Judgment, contends that "the loss" it sustained on March 15, 2011, must be "sudden and accidental" per the policy.  Kelman argues that because the loss was sudden and accidental, Continental breached the terms of the insurance policy by failing to provide coverage and suggests that this Court enter such a declaration and allow a jury to determine the amount of damages to be awarded for this alleged breach.

Under the Pennsylvania case law discussed immediately above, the primary duty of this Court is to ascertain the parties' intent as manifested in the language of Continental's insurance policy, and the Court must do so by reading Continental's  policy "as a whole" while construing its meaning according to the policy's plain language.

The insurance policy issued by Continental is described as an "Equipment Breakdown" policy.  See doc. no. 97-1.  Accordingly, this Court finds that, on the whole, Continental's insurance policy was designed to provide coverage to Kelman[3] when a breakdown in the insured's equipment occurred.[4]  The Continental policy states that, "'Breakdown' . . . [m]eans

---

[2] Continental secondarily argues that the valuation provision of its policy required Continental to pay to the cost to repair, rebuild, or replace the furnace – which ever was less costly – based on proof of each cost proffered by Kelman.  Continental then asserted that Kelman only proffered the cost of rebuilding the furnace ($3,800,000.00), and never attempted to secure a cost to repair the furnace.  Continental also asserted that Kelman failed to produce any evidence to support its contention that the need to rebuild the furnace resulted solely from the March 15, 2011 leak, as opposed to damage the furnace incurred during the other prior leaks.  The Court does not need to consider these arguments as will be discussed, *infra*.

[3] Per the Continental policy produced to the Court at doc. no. 97-1, only Kelman Glass, LLC is an insured.

[4] Continental's policy at issue here does exclude coverage for "a breakdown" that is caused by certain causes; however, the parties agree that none of those causes led or contributed to the event of March 15, 2011.

sudden and accidental direct physical loss to 'Covered Equipment' . . . ."[5]  Doc. no. 97-1 at

Bates no. 02800.

     Given the fact that the parties to the Continental insurance policy agree that the furnace

at issue is "Covered Equipment," this Court must determine as a matter of law is whether an

ambiguity exists with respect to the phrase "sudden and accidental."

### a. Sudden and Accidental – Defined

     The phrase "sudden and accidental" has been defined by Pennsylvania courts in a

pollution exclusion context – not in the context of equipment breakdown.  *See Lower Paxton*

*Twp. v. United States Fire and Guaranty Co.*, 557 A.2d 393, 397 (Pa. Super. 1989) ("[T]he

plain meaning of ["sudden and accidental"] requires that damages resulting from gradual

releases of pollution are excluded from coverage."); *Northern Ins. Co. v. America Northern*

*Aadrvark Assoc., Inc.*, 942 F.2d 189, 193 (3d Cir. 1991) ("We therefore hold, in accordance

with the decisions of the Superior Court of Pennsylvania, that the exception for 'sudden and

accidental' discharges applies only to discharges that are abrupt and last a short time.");

*Chemetron Invs., Inc. v. Fidelity & Cas. Co. of New York,* 886 F.Supp. 1194, 1197 (W.D. Pa.

1994) (Under Pennsylvania law, "the exception for 'sudden and accidental' discharges applies

only to discharges that are abrupt and last a short time.").  In *Sunbeam Corp. v. Liberty Mut.*

*Ins. Co.,* 1997 WL 1073957 (Pa. Co. Pl. April 2, 1997), another pollution exclusion case, the

Court of Common Pleas of Allegheny County, upon review of the *Lower Paxton* decision

stated as follows:

     [O]n several occasions the Pennsylvania Superior Court has rejected the
     argument that the pollution exclusion may be reasonably construed to exclude
     coverage only in cases where the damage was intended or expected. The court

---

[5] Continental and Kelman agree that the furnace, which leaked on March 15, 2011, is "Covered Equipment."

has said that any interpretation of the clause which defines "sudden" as meaning only unexpected or unintended is "blatantly unreasonable."

*Id.* at *7.[6]

Continental contends that the phrase "sudden and accidental" – found in the definition of "breakdown" in its own policy – is not ambiguous and argues that this Court must enforce the plain meaning of the words "sudden and accidental."  Although Kelman does not state whether it considers the phrase "sudden and accidental" to be ambiguous, it concurs with Continental that the Pennsylvania Superior Court in *Lower Paxton* defined "sudden" as "abrupt and only lasting a short time" and "accidental" as "unexpected or unintended."  Thus, the parties concur on the definition of "sudden and accidental" as "abrupt and lasting a short time" (*i.e.* sudden), and "unexpected or unintended" (*i.e.* "accidental").

Both parties rely (to varying degrees) on *Cyclops Corp. v. Home Ins. Co.*, 352 F.Supp. 931 (W.D. Pa. 1973), to support their respective positions concerning whether the leak or the resultant damage must be "sudden and accidental."  The relevant portion of the *Cyclops* opinion regarding whether "sudden and accidental" refers to the cause or the damage reads as follows:

> The parties are in dispute as to whether the "cause" of the damage is an essential element of proof.  Plaintiff does not dispute defendant's evidence as to "cause", but asserts that under the policy provisions applicable "cause" is not an issue in this damage claim.  Again we must examine all of the policy provisions. We do not find that the definition of "accident" requires any consideration of the term "cause."  The term "accident" requires only "sudden and accidental damage" which "necessitates repair," and we find these conditions met.

*Id*. at 937.

---

[6] Although this Court finds the above cases informative, it recognizes that these cases are not entirely dispositive on the matter presently before this Court.

14

Although Continental concedes that *Cyclops* ultimately concludes that the cause of the damage is not relevant, Continental essentially tries to distinguish the facts of this case from those in *Cyclops* by noting that in *Cyclops,* the piece of equipment at issue was only two years into its expected twenty-year life.  Here, Continental argues, the insured possessed ample information that the furnace at issue would probably undergo a major glass leak.  Continental contends that this distinction supports its position that the leak (which allowed molten glass to escape and thus, the "cause" of the resultant damage) is germane and is what must be "sudden and accidental."

In contrast, Kelman contends that *Cyclops* stands for the proposition that cause is never important and that the resultant damage (*i.e.* the loss) must be "sudden and accidental."

Taking direction from *Cyclops*, this Court, notes that the term "breakdown" is defined by Continental's policy as the "sudden and accidental direct physical loss to Covered Equipment . . . ."   A plain reading of the policy language where "sudden and accidental" is referenced (*i.e.*, "'Breakdown' . . . [m]eans sudden and accidental direct physical loss to 'Covered Equipment'") would suggest that "sudden and accidental" designates the nature of the loss sustained by Kelman, not the nature of the cause of the loss.

Moreover, under the last-antecedent rule, "loss" is the word in the policy which is impacted by the qualifying phrase "sudden and accidental."  Thus, the loss Kelman sustained had to be sudden and accidental per Continental's policy.

Accordingly, the issue of whether Kelman's "loss" (*i.e.,* its damage) was indeed "sudden and accidental" is the next issue for this Court to determine.

**b. Sudden and Accidental – As Applied**

Based on the plain meaning of the phrase "sudden and accidental" as "abrupt" and "unexpected or unintended," if the loss was "abrupt" <u>and</u> "unexpected <u>or</u> unintended," Continental would be required to provide coverage to Kelman.  Conversely, if the loss was "abrupt" but "expected or intended" by Kelman then the definition of breakdown would not be met and Continental would not be required to provide coverage.  Put another way, if Kelman could have expected the loss at issue to occur, the loss would not be "sudden and accidental" as simply defined.

Although Continental concedes that Kelman did not intend for the furnace at issue to leak and that Kelman could not have known exactly when the next leak would occur, Continental argues that Kelman expected that a leak would happen, and thus, the current loss was not "unexpected."  Doc. no. 96 at pp. 6-7.  The Court is persuaded by evidence of record which supports Continental's argument in this regard.

The Court finds that, based on the uncontroverted and relevant evidence submitted by Kelman and the two insurers as discussed in the fact section above at subpart "I." of this Opinion, Kelman expected leaks to occur.  Moreover, based upon the uncontroverted, material evidence of record, Kelman expected another leak to occur subsequent to the two, June 4, 2010 leaks.  Perhaps the most convincing piece of evidence is the admissions set forth in the emails from Kelman's Furnace Manager, Doug Hilliard, to Eleni Soutiriou, approximately one month prior to the event at issue in this litigation.  On February 2, 2011 Mr. Hilliard wrote:

> I think we should be extremely worried.  In my opinion if this block falls into the throat and causes a blockage, we will have no other option than shutting the furnace down, draining it and do a full repair on the whole melting end.

Doc. no. 97-18.  Then, four days later, on February 6, 2011, Mr. Hilliard again wrote to

Mr. Soutiriou stating:

> We have had some movement in the blocks on the front wall overnight.  The
> block to the left, or to the north side of the wall, has remained stable, but the
> block on the right, or the south side has shown some additional slippage. The
> crack in the bridge-wall above this area seems to have become more prominent.

Doc. no. 97-20.

Given these emails which evidence knowledge possessed by Kelman just days before

the leak which led to the loss occurred, it is clear that Kelman was concerned about the result if

the block fell "into the throat and cause[d] a blockage," and Kelman even anticipated having to

shut the furnace down to prevent a loss that could not be contained.  Four days after these

concerns are shared among Kelman employees, the block on the north side of the wall exhibits

movement and the crack in the bridge wall appears to the furnace manager to become more

prominent.

Moreover, the independent review performed by GFM in May of 2009 established that

certain repairs needed to be made.  Doc. no. 97-8.  GFM's report specifically suggested which

repairs needed to be done if Kelman intended to run the furnace for more than two years.  *Id.*

Kelman admitted that although it did "more overcoating" than was suggested by GFM, it did

<u>not</u> make some of the "other repairs" that GFM recommended.  Doc. no. 121 at ¶ 24.

Although Kelman did not know the exact date or time of the March 15, 2011 leak, nor

the extent of the loss/damage that the leak would cause, there is no dispute of material fact to

suggest that Kelman did not expect another leak to occur.  Moreover, the evidence of record

suggests that such a leak would lead to a loss, and that Kelman was aware of this.  See, *e.g.*

deposition testimony of Kelman's furnace manager Doug Hilliard, at doc no. 93-3, pp. 57-59.

Thus, the definition of "sudden and accidental" is not met and a "breakdown" as defined by Continental's policy did not occur.  Accordingly, based on the foregoing law and authority as applied to facts present in this case, and viewing all material evidence in a light most favorable to Kelman, this Court will enter an Order consistent with this portion of the Opinion granting Continental's Motion for Summary Judgment and denying Kelman's Cross-Motion for Partial Summary Judgment as to Continental.

### 2.  U.S. Fire's Motion for Summary Judgment and Kelman's Motion for Partial Summary Judgment as to U.S. Fire

Unlike Continental, which issued Kelman an equipment breakdown policy, U.S. Fire issued Kelman an "all risk" insurance policy.  However, the principles and rules of contract interpretation under Pennsylvania law, as discussed in "III. A." above, also apply to U.S. Fire's insurance policy with Kelman.

Kelman's breach of contract Counterclaim against U.S. Fire alleges that by denying insurance coverage, U.S. Fire breached its contract with Kelman.  Although U.S. Fire admits that it denied coverage to Kelman, it denies that in doing so it breached its contract with Kelman.  In support of its argument that summary judgment should be entered in its favor, U.S. Fire primarily argues that coverage for the leak is excluded by its policy.

The Court begins its analysis by placing the burden of proof on U.S. Fire, to prove that no coverage is warranted, for the reasons stated in its Motion and Brief in Support of Summary Judgment.  In doing so, the Court views all evidence in the light most favorable to Kelman.  If the Court finds in favor of U.S. Fire (and it does for the reasons discussed below), then Kelman cannot sustain its burden of proof in its own Motion for Summary Judgment when all evidence is viewed in a light most favorable to U.S. Fire.

**a. U.S. Fire's Policy – Inherent Risk Exclusion**

U.S. Fire concedes that its "all risk" policy provides coverage to Kelman for direct physical loss of, or damage to, "covered property" that is caused by or resulting from a "covered cause of loss."   Doc. no. 1-4 at p. 49 (CP 10 06 07, p. 1).   A "covered cause of loss" in its "all-risk" policy includes all direct physical loss unless specifically excluded or limited by the policy.  Doc. no. 1-4 at CP 10 30 06 07, p. 1.  Additionally, this U.S. Fire policy issued to Kelman contained additional coverage for loss or damage resulting from molten material.  Doc. no. 1-4 at p. 81 (CP 10 30 06 07, p. 9).

In support of its position that summary judgment should be granted in its favor with respect to Kelman's breach of contract Counterclaim, U.S. Fire argues that its insurance policy specifically excludes coverage under what is referred to as an "inherent vice exclusion."

The purported "inherent vice exclusion" located within U.S. Fire's insurance policy reads in relevant part:

> B. Exclusions
> *                  *                  *
> 2. We will not pay for loss or damage caused by or resulting from any of the following:
> *                  *                  *
> d.        (1) Wear and tear,
>            (2) Rust, corrosion, decay, deterioration, hidden or latent defect, or any quality in property that causes it to damage or destroy itself.

Doc. no. 1-4 at p. 75 (CP 10 30 06 07, p. 3).

In response to U.S. Fire's position, Kelman primarily argues that the "inherent vice" exclusion does not enable U.S. Fire to escape its duty to provide coverage because U.S. Fire cannot meet its burden of proving that the sole, proximate cause of the March 15, 2011 loss was due to either "inherent vice" or "wear and tear."

Kelman asserts in its brief that under Pennsylvania law, the insurer bears the burden of proving that any exclusion: is (1) unambiguous; (2) that the exclusion applies in the given instance; and (3) that that any exceptions to the exclusion do not apply.   As to the first requirement, the parties do not contest that the language of the above exclusion is ambiguous, and the Court likewise finds that it is not ambiguous.

As to the second requirement, in *Peters Twp. Sch. Dist. v. Hartford Acc. and Indem. Co.*, 833 F.2d 32 (3d Cir. 1987), the United States Court of Appeals for the Third Circuit held:

> . . . The burden of proof of the insurance company that a loss comes within the scope of an exception or an exclusion is an affirmative one.  It is only when the existence of facts constituting an affirmative defense is admitted by the insured, or is established by uncontradicted testimony in the insured's case, that such burden is removed from the insurance company.

*Id.* at 37.  Thus, Kelman is correct that U.S. Fire bears the burden of proof with respect to the scope of an exclusion and/or exception; however, if Kelman admitted facts or provided uncontradicted testimony which supports U.S. Fire's position, the burden would then be satisfied.

In addition to the above, the Court of Appeals defined "inherent vice" as:

> . . . [A] cause of loss . . . [that] does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. . . . In other words, the question is whether the insured property . . . contain[s] its own seeds of destruction . . . [or] was threatened by an outside natural force.

*GTE Corp. v. Allendale Mutual Ins. Co.,* 372 F.3d 598, 611 (3d Cir. 2004) (internal quotes and citations omitted).

Although Kelman contests the application of the "inherent vice" exclusion, it has admitted the following: (1) ". . . all glass furnaces experience minor leaks on occasion[,]" (see doc no. 121, p. 5); (2) on March 15, 2011, molten glass escaped from the furnace, (*id.*);  (3)

20

Kelman's furnace manager, Doug Hilliard, had been involved with "with 'devastating' and 'unstoppable' leaks during his thirty years of experience in the glass industry[,]" (*id.*); and (4) "Kelman, like the prior owner of the plant, Glenshaw Glass Company, had a written procedure in place to deal with the potential for leaks from any of the furnaces." *Id*. at p. 6.

Given the uncontradicted testimonial evidence provided by Kelman, this Court finds that under the *Peters Twp.* case, U.S. Fire met its the burden of proving that furnace leaks are an inherent risk in the glass making business.

Moreover, given the definition of "inherent risk" adopted by the United States Court of Appeals in *GTE,* combined with the admissions made by Kelman whereby it agreed that the furnace was expected to (and did) leak molten glass, the unambiguous language of U.S. Fire's insurance policy indicates that U.S. Fire will not provide coverage for such an inherent risk. The policy unambiguously states that U.S. Fire will not pay for any "loss or damage caused by or resulting from . . . any quality in property that causes it to damage or destroy itself."  Here, as admitted by Kelman, the insured, there was an inherent risk of molten glass leaking from the furnace.   Kelman admitted the furnace in question leaked molten glass in the past and further admitted the furnace leaked the molten glass that caused the loss at issue in this litigation. Accordingly, this Court finds that based on the foregoing law and the uncontroverted facts present here, because the loss sustained by Kelman occurred as result of molten glass escaping the furnace, and because Kelman admitted that molten glass was an inherent risk to operating the furnace, the loss falls within U.S. Fire's inherent risk exclusion.

The Court now turns to the issue raised by Kelman as to whether there is an applicable exception to the policy's exclusion.

21

### b.  U.S. Fire's Policy – Molten Material Loss Exception

Kelman argues that even if U.S. Fire meets its burden of proof with respect to "inherent vice," Kelman's loss would still be covered by U.S. Fire's additional coverage provision for "molten material loss damage."  The relevant portion of the U.S. Fire policy reads as follows:

> F. Additional Coverage Extensions
>    *     *     *
>    2.       Water Damage, Other Liquids, Powder or Molten
>             Material Damage
>                     If loss or damage caused by or resulting from
>             covered . . . molten material damage loss occurs, we will
>             also pay the cost to tear out and replace any part of the
>             building or structure to repair damage to the system or
>             appliance from which the . . . substance escapes. . . .

Doc. no. 1-4 at p. 81, (CP 10 30 06 07, p. 9).

This unambiguous language raises the question of what is a "covered . . . molten material damage loss" as defined by the policy.  The Court, again, looks to the policy language to see how the parties agreed to define a "covered loss."  The policy states in pertinent part:

> A.       Covered Causes of Loss
>          . . . Covered Cause of Loss means Risks of Direct Physical Loss
>          unless the loss is:
>                  1. Excluded in Section B.
>
>                          *       *       *
> B. Exclusions
>                          *       *       *
>          2. We will not pay for loss or damage caused by or resulting
>          from any of the following:
>                          *       *       *
>          d.       (1) Wear and tear,
>                   (2) Rust, corrosion, decay, deterioration, hidden
>                   or latent defect, or any quality in property that
>                   causes it to damage or destroy itself.

*Id.* at pp. 73 and 75 (CP 10 30 06 07, pp. 1 and 3).

As noted above, the second enumerated exclusion in "Section B." of the policy was the inherent risk exclusion discussed immediately above.  Thus, the plain and unambiguous reading of U.S. Fire's policy is that it does not consider a loss caused by an inherent risk to be a covered loss.  Accordingly, the damage resulting from the molten glass escaping the furnace is not considered to be a covered loss because the escape of molten glass from the furnace was an inherent risk.

Put another way, the policy's "molten material loss exception" is predicated upon the loss being a covered loss.  In this case, because the escape of molten glass from the furnace was an inherent risk to operating a furnace containing molten glass, damage caused by the escape of the molten glass is excluded as a "covered" risk as the policy defines "covered . . . loss."  If some other hot, molten material, *i.e.,* something other than molten glass, had caused the loss at issue here, the "inherent risk" exclusion would not apply and (assuming no other exclusion were applicable) the "molten material loss exception" could have applied.  Accordingly, Kelman's second argument opposing U.S. Fire's position is erroneous.  The Court finds that the policy's exclusion applies and under the uncontested, relevant facts presented, the exception to the exclusion does not apply under the circumstances present in this case.

### c. **Pennsylvania's Current Causation Doctrine**

Kelman also contends that Pennsylvania has adopted the "concurrent causation doctrine" which, as applied here, means that if two or more causes concurrently caused Kelman's loss and one of the causes is covered under U.S. Fire's policy, U.S. Fire must provide coverage.  Kelman cites to *Colella v. State Farm Fire & Cas. Co.,* 407 Fed. Appx. 616, 662 (3d Cir. 2011), in support of its position.

23

In response, U.S. Fire argues that *Jefferson Bank v. Progressive Cas. Ins. Co.,* 965 F.2d 1274 (1992), stands for the proposition that U.S. Fire only has to prove by a preponderance of the evidence that the inherent risk was the efficient proximate cause of the loss.

In the more recent, unpublished, *Colella* opinion, the insureds sued their insurer alleging breach of an "all risk" insurance policy. The Court of Appeals, affirming the decision of the district court to deny coverage, found that the unambiguous language of the "subsurface water exclusion" in the policy applied so as to exclude coverage for damage caused by water below the surface of the ground, regardless of the cause of the subsurface water. This policy language was deemed to be "more expansive" than the language in a different policy in a case relied on by the Colellas.

The Court does not find that the *Collela* case stands for the proposition that Pennsylvania adopted a concurrent causation doctrine. The United States Court of Appeals stated as follows (referencing the doctrine without applying it):

> Finally, the Colellas argue that they are entitled to coverage under the "concurrent causation" or "efficient proximate cause" doctrine, which holds that "when there are two . . . or more causes of loss, the policyholder's claim is covered as long as the immediate or proximate cause of loss is covered by the policy." Appellants' Br. at 25 (citing, among other cases, *Trexler Lumber Co. v. Allemannia Fire Ins. Co. of Pittsburgh*, 289 Pa. 13, 136 A. 856, 858 (1927)). The District Court was correct in rejecting this argument because the lead-in clause of the State Farm policy ("[w]e do not insure for such loss regardless of: . . . (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss . . .") clearly negates the application of the doctrine.

*Id.* at 622. Thus, as is evident from the portion of the Opinion quoted above, the Court of Appeals never affirmatively stated that the concurrent causation doctrine would control the

coverage question.  Indeed, the Court of Appeals never had to consider the applicability

because the exclusion at issue so clearly negated the application of such a doctrine.

However, Kelman further contends that the concurrent causation doctrine would apply

here because there is no such "negating language" in the "inherent risk" exclusion at issue in

this case.  Kelman also contends that a "void" along with "wear and tear" and a "failure of the

coolant line" were the concurrent causes of the loss it sustained on March 15, 2011.  See doc.

no. 117, pp. 3-10.

The Court need not (and does not) comment on whether Pennsylvania has adopted a

"concurrent causation doctrine," because this Court finds that the guidance provided by the

Court of Appeals in its *Jefferson (supra.)* decision, as well as in *PECO Energy Co. v. Boden*,

64 F.3d 852 (3d Cir. 1995), provide sufficient guidance to decide this issue.

In *PECO*, the insured sued to recover for a series of thefts of fuel oil under its "all-risk"

cargo transit policies.  The Court first affirmed the district court's holding that a series of thefts

amounted to one "occurrence." *Id.* at 856.  In reaching this conclusion, the Court of Appeals

noted that in a prior case (*Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56

(3d Cir. 1992)), it had held that "an occurrence" was determined by the cause or causes of the

resulting injury.  *Id.*  The Court further reiterated that the district courts should determine if

there was "but one proximate, uninterrupted and continuing cause which resulted in all of the

injuries and damage." *Id.*, citing *Appalachian*, 676 F.2d at 61.  If a court were determine that

there was "but one proximate, uninterrupted and continuing cause," then a single occurrence

has taken place.

In *Jefferson,* the bank sued to recover on a banker's blanket bond when the morgatee

defaulted.  The Court of Appeals held that there was a question of material fact as to whether

the forgery of a notary's signature was a substantial factor in the bank's decision to issue the

mortgage, thereby reversing the district court's grant of summary judgment.  The Court of

Appeals noted:

> . . . the policy's language makes clear by its terms that the Banker's Blanket
> Bond does not cover loan losses suffered by an insured bank unless (1) the loss
> resulted from the bank's having acted in good faith in reliance on a
> mortgage . . . that was defective because it bore a signature that had been
> obtained through fraud . . .

*Id*. at 1277-78.  The district court had noted that under the provisions cited above, Jefferson

had to demonstrate that its loss resulted directly from the its extension of credit in good faith

reliance on a mortgage that bore a forged signature. The district court acknowledged that the

mortgage contained a forgery (*i.e.* the signature of the notary), but declined to enforce coverage

because, in the district court's view, the loss did not "result directly from" this defect.

The Court of Appeals in *Jefferson* then explored the definition "resulting directly from"

under Pennsylvania law.  In this regard, the Court analyzed the phrase and held in pertinent

part:

> . . . the phrase "resulting directly from" in the policy does suggest a stricter
> standard of causation than mere "proximate cause."  Under Pennsylvania tort
> law, a cause is proximate if it is merely a "substantial cause" of the harm. *See
> Whitner v. Von Hintz*, 437 Pa. 448, 263 A.2d 889, 893-94 (1970).  Arguably, the
> words "resulting directly from" suggest a requirement beyond that the cause be
> substantial, for the words imply that the loss must flow "immediately," either in
> time or space, from the forged signature.  An analysis of Insuring Agreement E
> in light of Pennsylvania law persuades us, however, that conventional proximate
> cause is indeed the correct standard and that requiring "immediacy" is
> inappropriate.

*Id*. at 1281.  The Court concluded that "an accurate prediction of Pennsylvania law is that

'resulting directly from' means 'proximately caused by.'"  *Id*.  Finally, the Court noted that

"immediate cause" was "a nebulous and largely indeterminate concept" and one that was not

favorably accepted under Pennsylvania law.  *Id*.  Based on this thorough analysis, the Court

concluded that the language "resulting directly from" means "proximately caused by."  *Id*. at

1282.

Turning to this case, Kelman argues that the absence of the word "directly" eliminates

the possibility that this case is akin to *Jefferson*.   Indeed the word is absent from the inherent

defect exclusion relied upon by U.S. Fire:

> B. Exclusions
>                     *      *      *
> 2. We will not pay for loss or damage caused by or **resulting from** any
> of the following:
>                     *      *      *
>     d.     (1) Wear and tear,
>              (2) Rust, corrosion, decay, deterioration, hidden or latent
>              defect, or any quality in property that causes it to damage
>              or destroy itself.

Doc. no. 1-4 at p. 75 (CP 10 30 06 07, p. 3) (emphasis added).

However, as noted above, reading *Jefferson* in line with *PECO,* there can be little doubt

that proximate cause provides the basis for determining whether a single occurrence took place

as well as whether an occurrence causes the loss at issue.  Thus, this Court finds that the

absence of the word "directly" in the inherent risk exclusion does not open the door a

concurrent causation analysis.  Looking again at the unambiguous language of the inherent risk

exclusion, the loss had to result – arguably, directly or indirectly – from the inherent risk of

operating a furnace containing molten glass.  Put this context, the inherent risk of operating a

furnace containing molten glass had to be the proximate cause of the loss.

Importantly, the parties concur that the escape of the molten glass is what caused

Kelman's loss on March 15, 2011.  What caused the molten glass to escape from the furnace is

another matter entirely, and not one that must be decided in order for the Court to determine

that the escape of the molten glass was the proximate cause of Kelman's March 15, 2011 loss.

Accordingly, after placing all of the evidence in the light most favorable to Kelman, the

Court finds none of Kelman's arguments persuasive, and thus, will grant U.S. Fire's Motion

for Summary Judgment, and will issue a declaration of no coverage as requested by U.S. Fire

in its Motion.   Because this Court had to view the evidence in a light most favorable to

Kelman when evaluating U.S. Fire's Motion, Kelman's Motion for Summary Judgment on its

breach of contract Counterclaim will be denied.[7]

### B. Kelman's Bad Faith Claim Against U.S. Fire

The Pennsylvania statute governing bad faith insurance actions provides as follows:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> > (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> >
> > (2) Award punitive damages against the insurer.
> >
> > (3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

In order to recover on a bad faith claim, the insured must prove: (1) that the

insurer did not have a reasonable basis for denying benefits under the policy; and

(2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in

---

[7]  In light of the fact that the Court is granting U.S Fire's initial Motion for Summary Judgment (doc. no. 93) based on the arguments raised therein and as further expounded upon its Brief in Support (doc. no. 94), and because Kelman's Motion for Partial Summary Judgment as to U.S. Fire (doc. no. 103) will be denied, U.S. Fire's Cross-Motion (doc. no. 112) will be denied as moot.

denying the claim. *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir.2005); *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994). "Although the insurer's conduct need not be fraudulent, 'mere negligence or bad judgment is not bad faith.'" *Babayan*, 430 F.3d at 137 (internal quotation omitted). Ultimately, the burden is on the insured to prove such "bad faith" by clear and convincing evidence. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 528 (3d Cir. 1997); *Terletsky*, 649 A.2d at 688. At the summary judgment stage, the insured's burden in opposing a summary judgment motion is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Babayan*, 430 F.3d at 137 (quoting *Kosierowski v. Allstate Ins. Co.*, 51 F.Supp.2d 583, 588 (E.D. Pa.1999)).

Although "bad faith" is not defined by Pennsylvania's statute, courts interpreting Pennsylvania law have held that a claim under 42 Pa.C.S.A. § 8371 contains two elements: (1) the insurer lacked a reasonable basis for denying benefits under the applicable policy, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for refusing the claim. *Employers Mut. Cas. Co. v. Loos*, 476 F.Supp.2d 478, 490 (W.D. Pa. 2007) (citing *Terletsky*, 649 A.2d at 688).

The standard of proof required to establish a statutory bad faith claim against an insurer under Pennsylvania law is clear and convincing evidence. *See Loos*, 476 F.Supp.2d at 491 (citing *Terletsky*, 649 A.2d at 688) (footnote omitted); and *Babayan*, 430 F.3d at 137 (citing *Terletsky, supra*). "The 'clear and convincing' standard requires that the [insured] show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" *J.C. Penney Life Ins. Co. v.*

29

*Pilosi*, 393 F.3d 356, 367 (3d Cir.2004) (quoting *Bostick v. ITT Hartford Group, Inc.*, 56 F.Supp.2d 580, 587 (E.D.Pa.1999)).

In the case at bar, Kelman's bad faith claim is predicated (in large part) on U.S. Fire's denial of insurance coverage under the all-risk policy.  Doc. no. 10, ¶¶ 100, 145.  To the extent that Kelman's claim is predicated upon the denial of coverage without any reasonable basis, that claim is now foreclosed by this Court's Opinion finding that U.S Fire did not breach its contract with Kelman.

Under Pennsylvania law, there is some authority wherein circumstances existed so as to enable a bad faith claim to proceed even when a breach of contract claim was dismissed.  In *March v. Paradise Mut. Ins. Co.*, 646 A.2d 1254 (Pa. Super. 1994), the Pennsylvania Superior Court affirmed the trial court's dismissal of a breach of contract claim based on the expiration of the statute of limitations, but held that the bad faith claim could proceed because it was not subject to the one-year statute of limitations.

In *Polselli v. Nationwide Mut. Fire Ins. Co.,* 126 F.3d 524 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit acknowledged the *March* decision (among others) noting that, "a Pennsylvania intermediate appellate court [ ] held that claims brought under section 8371 are distinct from the underlying contractual insurance claims from which the dispute arose." *Id*. at 529 (internal quotes and citations omitted).  The Court went on to state, "While not obvious from the language of section 8371, it is apparent that Pennsylvania courts have interpreted section 8371 to create a cause of action that exists separately and independently from a claim on the insurance contract itself." *Id.* (internal quote and citation omitted).  Expanding on this comment the Court held:

> Initially, we observe that under the plain language of the statute, it is reasonably clear that a section 8371 claim may not be the sole claim of an insured.  Section 8371 provides that "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions. . . ." 42 Pa. Cons. Stat. Ann. § 8371.  This language implies that a determination of bad faith is merely an additional finding to be made in a predicate action arising under an insurance policy.  Absent a predicate action to enforce some right under an insurance policy, an insured may not sue an insurer for bad faith conduct in the abstract.

*Id.* at p. 530.

In *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.,* 193 F.3d 742 (3d Cir. 1999), the insured (Frog) provided its insurance carriers (Travelers and U.S. Fire) with notice that it had been sued for (*inter alia*) false advertising and reverse passing off under the Lanham Act.  *Id.* at 745.  The insurers refused to defend Frog in the underlying litigation and Frog sued both companies for breach of contract and bad faith.  *Id.*  The district court granted U.S. Fire's Motion to Dismiss and Traveler's Motion for Summary Judgment.  *Id.*  On appeal, the Court of Appeals affirmed, noting that it need only review the issue surrounding the insurers' duty to defend, which is a broader duty than an insurer's duty to indemnify.  *Id.* at 746.  Given the allegations in the underlying Complaint and Second Amended Complaint filed against Frog and the language of the insurance policies, the Court held that Pennsylvania courts would not find that the allegations fell within a reasonable understanding of the policy's terms and conditions.  *Id.* at 750.  In a footnote, the Court also rejected Frog's bad faith claim stating that, " . . . where there was no duty to defend, there was no good cause to refuse to defend against a suit." *Id.* at 751, n.9.

In *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,* 244 Fed. Appx. 424 (3d Cir. 2007), the Court of Appeals discussed both the *March* decision and the *Frog* decision.  Affirming a

bad faith verdict against the insurer, the Court concluded that *Frog* did not preclude the Court

from allowing a bad faith claim (which led to a punitive damage award) to proceed in the

absence of other successful claims. *Id.* at 435. However, in reaching this conclusion the Court

noted:

> . . .we find that this is one of the exceedingly rare cases in which an insurer can
> be liable for bad faith even after the insured cancels the policy. Here, the bad
> faith allegations were not based simply on the insurer's representations that
> there was not a valid policy. Indeed, both parties believed that a policy existed
> for a large part of the relevant time period, and acted accordingly. Based on the
> evidence in the record, a jury could have found – and, indeed, did find – that
> Westchester acted in bad faith given its working assumption that the policy had
> not been canceled. Therefore, we will affirm the bad faith verdict against
> Westchester.

*Id.* at 435-6.

Turning now to the case at bar, Kelman contends that the bases for the denial of

coverage are as follows: "(1) [U.S. Fire] ignored facts that supported coverage under the

Policy; (2) [U.S. Fire] made no effort to meaningfully reevaluate coverage once facts in

contradiction of its position came to light; (3) [U.S. Fire] refused to evaluate coverage under

appropriate provisions of the Policy; (4) [U.S. Fire] forced the policyholder to exhaust its

limited financial resources with its litigation conduct, including raising the "kitchen sink"

defense to coverage, including raising defenses upon which it did not deny coverage in its

denial letter, and upon which it has no expert testimony." Doc. no. 117, p. 11.

Based on the case law established by the United States Court of Appeals for the Third

Circuit, this Court does not find that any of the four grounds or bases alleged by Kelman can

support its bad faith claim against U.S. Fire. Kelman's first and third arguments set forth

above are directly dependent on its breach of contract claim and thus, the bad faith claim

cannot survive based on those reasons. In addition, the Court does not find its fourth

contention to be a valid basis upon which a bad faith claim may rest, and Kelman cites no law

in support of its fourth proposition.   This leaves the second basis, which the Court will address

in greater detail.

Kelman alleges that U.S. Fire knew that the furnace underwent a rebuild in late 2003

through early 2004, but denied coverage based on the fact that the furnace had not undergone a

rebuild since 1994 and thus, had outlived its ten-year useful life.  See doc. no. 10, ¶¶ 108, 117-

119 and doc. no. 1-10.   However, Kelman proffers no substantive evidence in support its claim

in this regard other than its own conjecture on this point.   Even if U.S. Fire denied coverage

(in whole or in part) based on its erroneous belief that the furnace had not been rebuilt since

1994, this is not enough to legally support a claim for bad faith.  *See Winner Int'l Corp. v.

Continental Cas. Co.*, 889 F.Supp. 809 (W.D. Pa. 1994), *aff'd without opinion*, 54 F.3d 767 (3d

Cir. 1995) (mere negligence or bad judgment does not constitute bad faith; knowledge or

reckless disregard of a lack of a basis for denial of coverage is necessary).

In addition, all of the relevant evidence of record supports a finding that U.S. Fire

denied coverage (at least in part) based on the inherent risk exclusion of the policy.  See doc.

no. 1-10.   The parties agree that the denial letter was issued after U.S. Fire conducted an

investigation, which included sending an investigator to examine the furnace, subsequent to the

March 15, 2011 occurrence.   The documentary evidence of record, specifically the denial of

coverage letter issued by U.S. Fire in a section entitled "background facts," states in pertinent

part that, "[t]he documents which [Kelman] provided indicate that the last rebuild of [the

furnace] was in 1994."  Doc. no. 1-10. The section of the letter quotes from the policy and

specifically quotes the inherent risk exclusion.  *Id.*   Finally, in a section entitled, "Applicable

Exclusions and Limitations[,]" U.S. Fire explains its position with respect to the applicability

33

of the inherent risk exclusion to the March 15, 2011 loss and states there is no potential for coverage.  *Id.*  U.S Fire does not base its analysis in this portion of the letter on the (erroneous) fact that the furnace in question was last rebuilt in 1994.  *Id.*

The inherent risk exclusion was U.S. Fire's first and primary reason for disclaiming coverage to Kelman under its policy, and as discussed above in subpart "A.2.," it is the reason that this Court found no viable claim for breach of contract, and found that U.S. Fire was entitled to a declaration of no coverage.  Thus, even if U.S. Fire erroneously believed the most recent rebuild occurred in 1994, (a fact which it based on documentation Kelman provided), and even if U.S. Fire issued its denial of coverage letter based, in part, on the erroneous rebuild date, its denial predicated upon on the inherent risk exclusion did not rely on the date of the rebuild of the furnace.  Thus, upon learning of the true date of the rebuild, the denial of coverage based on inherent risk remained unchanged.

Accordingly, this Court finds that the denial of coverage was not made in bad faith for any of the reasons asserted by Kelman and therefore, will grant U.S. Fire's request that the Counterclaim alleging bad faith be dismissed.

**IV. CONCLUSION**

Based on the foregoing law and authority, U.S. Fire's Motion for Summary Judgment (doc. no. 93) will be granted.  Kelman's Partial Motion for Summary Judgment against U.S. Fire (doc. no. 103) will be denied.  In light of the foregoing, U.S. Fire's Cross-Motion for Summary Judgment (doc. no. 112) will be denied as moot.

Continental's Motion for Summary Judgment (doc. no. 91) will be granted.  Kelman's Motion for Partial Summary Judgment against Continental (doc. no. 98) will be denied.


<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc: all ECF registered counsel