IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES FIRE INSURANCE
COMPANY,

          Plaintiff, and Counterclaim
          Defendant,

                 v.

KELMAN BOTTLES LLC and KELMAN
GLASS, LLC,

          Defendants, Counterclaim
          Plaintiffs and Third Party
          Plaintiffs,

                 v.

CONTINENTAL CASUALTY COMPANY,
          Third Party Defendant.

11cv0891
**ELECTRONICALLY FILED**

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART
THIRD PARTY DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

     In this declaratory judgment action, brought by Plaintiff, United States Fire Insurance

Company ("U.S. Fire"), U.S. Fire seeks a declaration that it does not have to provide insurance

coverage under an all-risk policy it issued to Defendants, Kelman Bottles and Kelman Glass,

LLC ("Kelman").  Kelman filed Counterclaims against U.S. Fire and also filed a Third-Party

Complaint against Continental Casualty Company ("CNA") alleging both U.S. Fire and CNA

breached their respective insurance contracts and violated Pennsylvania's bad faith statute in

doing so. [1]

---

[1] U.S. Fire and Kelman settled their disputes on December 20, 2013.  The only remaining claims are those
filed by Kelman against CNA.

Presently before the Court is CNA's Motion for Partial Summary Judgment (and Brief in support of same) wherein CNA contends that the bad faith claim advanced by Kelman must be dismissed. Doc. no. 172-173. Kelman filed a Response and Brief in Opposition. Doc. nos. 181-182. CNA also filed a Concise Statement of Material Facts (doc. no. 174), to which Kelman filed a "Response in Opposition" to the Concise Statement of Material Facts (doc. no. 183) and also filed a "Counterstatement" of Facts.[2] Doc. no. 184. CNA filed a Reply to Kelman's Brief in Opposition on May 19, 2014. Doc. no. 192. Kelman filed a Sur-Reply on May 23, 2014. Doc. no. 204. The matter is now ripe for adjudication.

At the core of this insurance dispute, Kelman claims that the "occurrence" (*i.e.* the breakdown of its sole operational furnace) was "sudden and accidental," while the insurance carriers contend that the occurrence was not. With respect to the specific matter before the Court, Kelman sued CNA for violating Pennsylvania's bad faith statute. In order to recover on its bad faith claim, Kelman must prove by clear and convincing evidence: (1) that CNA did not

---

[2] The Court notes that Kelman did not strictly adhere to the filing of its purported additional "facts" as required by LCvR 56(C). Many of the facts set forth in Kelman's "Counterstatement of Material Facts" were set forth in the Statement of Facts prepared by CNA at doc. no. 174, and then admitted by Kelman in doc. 183. The Court makes this observation solely for the purpose of assisting counsel in the future from restating undisputed facts. LCvR 56(C) reads:

C. Opposition Requirements. Within 30 days of service of the motion for summary judgment, the opposing party shall file:

1. A Responsive Concise Statement. A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

a. admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
b. setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (See LCvR 56.B.1 for instructions regarding format and annotation); and
c. setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment;

have a reasonable basis for denying benefits under the policy; and (2) that CNA knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. As will be discussed in greater detail below, the Court concludes that CNA did have a reasonable basis for denying benefits under its insurance policy. Given this conclusion, the Court need not reach nor discuss the second prong of the two-part test. Accordingly, the Court will enter an Order granting that portion of CNA's Motion for Partial Summary Judgment requesting that Kelman's bad faith claim be dismissed.

The Court will deny CNA's Motion for Partial Summary Judgment in all other respects, as those remaining portions of CNA's Motion attempt to limit Kelman's damages on its breach of contract claim against CNA. The arguments CNA makes in this respect are more properly brought as Motion(s) *in Limine*.

## I. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 514 (3d Cir. 2012), citing Fed.R.Civ.P. 56(a) ("A court may 'grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'").

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986); *see also Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011); *Smith v. Borough of Dunmore*, 516 Fed. Appx. 194, 200 (3d Cir. 2013). Disputes must be both (1) material, meaning

concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning there is sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial. *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011); *see also S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248 (3d Cir. 2013).

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – i.e., depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed. R. Civ. P. 56(c)(1). The moving party may discharge its burden by "pointing out to the district court" the "absence of evidence to support the nonmoving party's case" when the nonmoving party bears the ultimate burden of proof for the claim in question. *Conoshenti v. Public Service Elec. & Gas Co*, 364 F.3d 135, 140 (3d Cir. 2004) (quoting *Singletary v. Pennsylvania Dept. of Corrections*, 266 F.3d 186, 192 n. 2 (3d Cir. 2001)). *Estate of Beim v. Hirsch*, 121 Fed. Appx. 950, 953 (3d Cir. 2005).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). Fed. R. Civ. P. 56(c)(1). When determining whether there are any genuine issues of material fact, all inferences should be drawn in favor of the non-moving

party.  *Gallup v. Clarion Sintered Metals, Inc.*, 489 Fed. Appx. 553, 555 (3d Cir. 2012);

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

In sum, "In determining whether such relief is warranted, '[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Post*,

691 F.3d at 514, quoting *Anderson*, 477 U.S. at 255 (1986). The inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." 477 U.S. at 251–52.

In reviewing a motion for summary judgment, the court does not make credibility

determinations, and summary judgment is "inappropriate when a case will turn on credibility

determinations." *El v. Southeastern Pennsylvania Transp. Authority*, 479 F.3d 232 (3d Cir.

2007).

## II. RELEVANT FACTUAL HISTORY

The following facts are undisputed and material unless otherwise stated.

Prior to March 15, 2011, Kelman operated a glass manufacturing facility in Glenshaw,

Pennsylvania, where it produced glass containers for the food industry.  Complaint, doc. no. 1,

¶¶ 3, 8-9; see also Kelman's Pretrial Statement, doc. no. 187, p. 2.  The facility contains several

furnaces for melting glass.  Doc. no. 1, ¶ 11.  From 2007 to March 15, 2011, Kelman operated

only one furnace at the facility.  Id., ¶¶ 15-16.

Kelman has indicated that this particular furnace "typically [has] a ten[-]year lifespan."

Kelman's Pretrial Statement, doc. no. 187, p. 2.  Kelman has also indicated that "every nine

years the [f]urnace underwent a rebuild, which includes the of the replacement of the glass

containment block in the melter."  Id.  Kelman has stated that the prior owner of the furnace

replaced the containment block in December 2003 and January of 2004. Id. At the end of January 2004 the furnace "underwent a controlled cool down and was idle until January of 2007" when Kelman began using the furnace to produce glass. Id. By Kelman's calculation, the furnace was in year five of its rebuilt ten-year life span when the incident occurred. Id.

On March 15, 2011, molten glass escaped from the furnace ultimately resulting in physical damage to the furnace and other property. Doc. no. 1, ¶ 21. Kelman timely placed its insurers (including CNA) on notice of the March 15, 2011 leak claim.[3] Amended Third Party Complaint, doc. no. 149, ¶ 21.

On March 17, 2011, an engineer hired by CNA (David Bizzak) met with Kelman representatives (and others), interviewed Kelman employees, obtained records (including the furnace logs), and inspected the furnace. Kelman's Response to CNA's Statement of Facts, doc. no. 183, ¶¶ 8-12. A Reservation of Rights letter ("ROR letter"), dated March 22, 2011, was sent to Kelman on behalf of CNA, acknowledging the claim and advising Kelman of its investigation, which, as noted immediately above, had already begun. Id., ¶ 15, 19. The ROR letter contained the wrong definition of "Breakdown" – a key term defined by the policy.[4] Id., ¶¶ 16-18.

On March 23, 2011, CNA, through its adjuster, Goewey, received a copy of Bizzak's four-page report which contained nine photographs ("Bizzak report"). Id., at ¶ 29. After

---

[3] Kelman also notes in its Pretrial Statement, ". . . all glass furnaces experience occasional seepage and glass manufacturers typically have written procedures in place to deal with these types of leaks." Doc. no. 187, p. 3.

[4] A copy of CNA's policy (which contained the correct definition of "Breakdown") was sent to Kelman on or about April 7, 2011. Kelman's Response to CNA's Statement of Facts, doc. no. 183, ¶ 24. Kelman claims that CNA's adjuster, Goewey, intentionally or recklessly disregarded CNA's fiduciary obligation to Kelman when he quoted the wrong definition of "Breakdown." Id., ¶ 17. Kelman further claims that CNA used the incorrect definition of "Breakdown" when adjusting Kelman's claim thereby further intentionally or recklessly disregarding CNA's fiduciary obligation to Kelman. Id. ¶ 27. Both Goewey and his supervisor at CNA testified that Goewey quoted the wrong language in the ROR letter merely by mistake. Id. ¶ 17.

receiving the Bizzak report, CNA contacted U.S. Fire on March 23, 2011, and told U.S. Fire that

Kelman's loss was not a boiler and machinery claim, but was in fact, a property claim. Id., ¶ 31.

That same day, March 23, 2011, CNA notified Kelman's insurance broker that CNA would

decline coverage under the CNA policy. Id., ¶ 32.

On March 25, 2011, U.S. Fire notified Kelman via email that it had retained its own

consultants who visited the Kelman plant twice – once in late March of 2011, and once in May

of 2011 – to inspect the Furnace at issue. Id., ¶ 40.

On April 20, 2011, Kelman retained a public adjuster, Randall Goodman, to represent

Kelman in its pursuit of insurance coverage. Id., ¶ 47. On April 27, 2011, Goodman spoke with

Goewey at CNA, and Goewey told Goodman that CNA was going to deny coverage based on the

Bizzak report. Id., ¶ 50. The Bizzak report concluded as follows:

Conclusions

Based upon my review and analysis of available evidence, it is my opinion, within a reasonable degree of engineering certainty, that the March 15, 2011 incident at Kelman Bottles Glenshaw facility did not occur as a result of operator error or the specific failure of a component of the furnace and/or its associated controls. On the contrary, the initial leak below the top of the molten glass was not uncommon either in its occurrence or location. That is, Mr. Hogan [Kelman's plant manager] indicated that leaks near the surface of the molten glass within the furnace, although not frequent, can occur during glass color changeovers when temperature disturbances within the furnace occur. While such leaks are either self-sealing due to cooling of the escaping glass (very small leaks) or are manually arrested by cooling the glass with water lances, the subject leak occurred at a location that permitted molten glass to flow onto the cooling line of one of the electrodes. As a result of the loss of cooling to the electrode, molten glass began to flow out the casing of the electrode and the cooling jacket annulus. The resulting flow of molten glass out of three separate leakage pathways was too great to allow the flow to be sealed by cooling the glass using one or more water lances. Consequently, a significant volume of molten glass escaped the furnace before employees were able to arrest the flow.

Doc. no. 175-11, Ex. 60, p. 20.

Despite the March 23, 2011 oral denial of coverage which CNA made to Kelman's broker, and the April 27, 2011 oral denial of coverage which CNA made to Kelman's retained public adjuster (Goodman), CNA sent three letters to Kelman – one dated April 11, 2011, one dated May 6, 2011, and one dated June 9, 2011. Doc. no. 175-17, pp. 10-14; and doc. no. 175-15, pp. 66-71. The April 11, 2011 letter indicated that CNA was "in the process of reviewing [Kelman's] claim." Doc. no. 175-17, p. 13-14. The May 6, 2011 letter indicated that CNA was "[s]till investigating the claim." Doc. no. 175-15, pp. 66-68. The June 9, 2011 letter stated that CNA was "in the process of verifying coverage" and that "[a] decision on this claim is anticipated by 06/23/2011." Id., pp. 69-71.

Additionally, there is no dispute between the parties that despite the March 23, 2011 and April 27, 2011 oral denials of coverage made by CNA to Kelman's broker and to Kelman's retained public adjuster, CNA did not issue a written denial letter until June 14, 2011. Moreover, there is no dispute that in the intervening months, CNA sent Kelman three letters suggesting its investigation was ongoing. See relevant references, above. There is also no dispute between the parties that during these intervening months, CNA monitored the status of U.S. Fire's investigation of Kelman's claim. Kelman's Response to CNA's Statement of Facts, doc. no. 183, ¶ 37.

As stated above, on June 14, 2011, a denial letter was sent by CNA to Kelman which included the correct definition of the term, "Breakdown." Id., ¶ 59. The parties agree that CNA's June 14, 2011 denial letter set forth reasons for the denial of coverage, but Kelman contends that the "reasons" were at a minimum unclear, and at worst, were intentionally vague in violation of Pennsylvania insurance law. Id., ¶¶ 34-36.

The June 14, 2011 denial letter sent by CNA to Kelman's retained a public adjuster

(Goodman) reads, in pertinent part, as follows:

> The purpose of this letter is to formally set forth Continental Casualty Company's reasons for its denial of coverage for this claim under your client's Boiler & Machinery Policy, BM4027236757, issued to Kelman Bottles, LLC with effective dates of March 14, 2011 to March 14, 2012.
>
> Your client explained that on March 15, 2011 they were in the process of producing bottles when a water line was damaged by the molten glass. This caused a drop in temperature and this caused the glass to cool and push upward. In this case the glass was pushed out of a hole in the furnace and approximately 120 gallons of molten glass spilled.
>
> We then contacted engineer Dave Bizzak with Romuladi Davidson & Associates and requested that he meet with your client and verify the cause of loss. Mr. Bizzak met with your client and verified the facts of the loss with him. He determined the loss did not occur as a result of operator error or the specific failure of a component of the furnace and/or its associated controls. The leak that occurred near the surface is not uncommon. Molten glass can leak during glass color changeovers when temperature disturbances within the furnace occur. The subject leak occurred at a location that allowed the molten glass to flow over one of the cooling lines of one of the electrodes. As a result there was a loss of this cooling electrode and molten glass began to flow out of the casing of the electrode and the cooling jacket annulus. This resulted in a flow of molten glass from three separate leak pathways and the amount was too great for cooling or water lances to stop. Thus there was a significant volume of molten glass that escaped from the furnace.

*    *    *

1. "Breakdown":

    a.    Means sudden and accidental direct physical loss to "Covered Equipment," which manifests itself by physical damage, necessitating its repair or replacement, unless such loss is otherwise excluded within this Coverage Form.

    b.    Does not mean or include:

        (1) Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

        (2) Defects, erasures, errors, limitations or viruses in computer equipment and programs including the inability

to recognize and process any date or time to provide instructions to "Covered Equipment";

(3) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

(4) Damage to any vacuum tube, gas tube, or brush;

(5) Damage to any structure or foundation supporting the "Covered Equipment" or any of its parts;

(6) The functioning of any safety or protective device; or

(7) The cracking of any part on an internal combustion gas turbine exposed to the products of combustion.

Continental Casualty Company will be unable to compensate you for this loss as there was not a "breakdown" as required per the above-cited policy language.

Doc. No. 175-15, Ex. 85, pp. 72-75.

Kelman sent a letter dated June 22, 2011 to CNA seeking further explanation for the denial of coverage. Kelman's Response to CNA's Statement of Facts, doc. no. 183, ¶ 37. CNA responded on August 26, 2011 indicating that the company's coverage position was set forth in the June 14, 2011 letter, and provided no further information. Id., ¶ 38; see also Ex. G to First Amended Third Party Complaint (doc. no. 149). Further written exchanges between Kelman and CNA took place, but ultimately, CNA provided no additional information concerning its denial of coverage to Kelman, despite Kelman's repeated requests for same.

## III. DISCUSSION

### A.  Pennsylvania's Bad Faith Law Requires Clear and Convincing Evidence

Kelman asserted a bad faith claim against CNA.  Pennsylvania[5] has a bad faith statute

which reads as follows:

> In an action arising under an insurance policy, if the court finds that the insurer
> has acted in bad faith toward the insured, the court may take all of the following
> actions:
>
> > (1) Award interest on the amount of the claim from the date the claim was
> > made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> > (2) Award punitive damages against the insurer.
>
> > (3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

Pennsylvania's definition of "bad faith" has evolved over time.  The Pennsylvania

Superior Court has recently defined the term "bad faith" in the insurance context as follows:

> ". . . In an early case, this Court looked to Black's Law Dictionary to define "bad
> faith" as "any frivolous or unfounded refusal to pay proceeds of a policy."
> *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d
> 680, 688 (1994), appeal denied, 540 Pa. 641, 659 A.2d 560 (1995); see also
> *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super. 1999).  In
> subsequent cases, we have held that to succeed on a claim under section 8371, the
> insured must show that "the insurer did not have a reasonable basis for denying
> benefits under the policy and that the insurer knew of or recklessly disregarded its
> lack of reasonable basis in denying the claim." S*ee, e.g.,  O'Donnell v. Allstate
> Ins. Co.*, 734 A.2d 901, 906 (Pa.Super. 1999) (citing *MGA Ins. Co. v. Bakos*, 699
> A.2d 751, 754 (Pa.Super. 1997)).  To constitute bad faith it is not necessary that
> the refusal to pay be fraudulent.  However, mere negligence or bad judgment is
> not bad faith. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380
> (Pa.Super. 2002).  *Id.* The insured must also show that the insurer breached a
> known duty (*i.e.*, the duty of good faith and fair dealing) through a motive of self-
> interest or ill will.  *Id.*"

---

[5] This Court, sitting in diversity, is bound to apply Pennsylvania state substantive law to this lawsuit.  The
parties concur.

*Grossi v. Travelers Personal Ins. Co.* 79 A.3d 1141, 1148-49 (Pa. Super. 2013), quoting *Berg v.*

*Nationwide Mut. Ins. Co., Inc.*, 44 A.3d 1164, 1170–1171 (Pa. Super. 2012).

As noted by the United States Court of Appeals for the Third Circuit in *Northwestern*

*Mut. Life Ins. Co. v. Babayan*:

> The statute does not define the term "bad faith." We have predicted that the
> Pennsylvania Supreme Court would define the term according to the definition set
> forth by the Pennsylvania Superior Court in *Terletsky v. Prudential Property and
> Casualty Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680 (1984). *See Keefe v.
> Prudential Property and Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir.2000). There,
> the court adopted the following definition of "bad faith":
>
> > "Bad faith" on part of insurer is any frivolous or unfounded refusal
> > to pay proceeds of a policy; it is not necessary that such refusal be
> > fraudulent. For purposes of an action against an insurer for failure
> > to pay a claim, such conduct imports a dishonest purpose and
> > means a breach of a known duty (*i.e.,* good faith and fair dealing),
> > through some motive of self-interest or ill will; mere negligence or
> > bad judgment is not bad faith.
>
> *Terletsky*, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed.1990))
> (citations omitted).

*Babayan*, 430 F.3d 121, 137 (3d Cir. 2005).

Furthermore, the Court of Appeals in *Babayan* held that the insured (Kelman in this case)

is required to meet its burden of proving "bad faith" by clear and convincing evidence. *Id.*,

citing *Terletsky, supra.* Although the insurer's conduct (here, CNA's conduct), need not be

fraudulent, "mere negligence or bad judgment is not bad faith." *Babayan,* 430 F.3d at 137, citing

*Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (2004).

"The 'clear and convincing' standard requires that the [insured] show 'that the evidence

is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation,

about whether or not the defendants acted in bad faith.'" *J.C. Penney Life Ins. Co. v. Pilosi*, 393

F.3d 356, 367 (3d Cir.2004) (quoting *Bostick v. ITT Hartford Group, Inc.*, 56 F.Supp.2d 580, 587 (E.D.Pa.1999)).

Thus, as applied to this case, in order to recover on its bad faith claim, Kelman must prove: (1) that CNA did not have a reasonable basis for denying benefits under the policy; and (2) that CNA knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. See *Babayan*, 430 F.3d at 137.

**B. Kelman's Bad Faith Claim against CNA**

Because CNA filed the instant motion, the burden is on CNA to show that there is no genuine issue as to any material fact, thereby entitling CNA to judgment as a matter of law. As noted immediately above, in order to prevail on its claim for bad faith, Kelman must prove: (1) that CNA did not have a reasonable basis for denying benefits under the policy; and (2) that CNA knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. Accordingly, the Court must determine whether any genuine issue as to any material fact exists that would show that: (1) CNA did not have a reasonable basis for denying benefits under the policy; and (2) CNA knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.

**1. CNA's Denial of Coverage**

Starting with the first prong of the two-part test set forth above, CNA argues that there is no genuine issue as to any material fact tending to prove that CNA lacked a reasonable basis to deny coverage to Kelman. Kelman, on the other hand, contends that there are facts which tend to prove that CNA's denial of coverage constituted bad faith.

As noted by the United States Court of Appeals for the Third Circuit, Kelman's bad faith claim requires clear and convincing evidence of bad faith on the part of CNA – not merely the

absence of evidence of good faith. *U.S. Fire Ins. Co. v. Kelman Bottles*, 538 Fed. Appx. 175, 183 (3d Cir. 2013).

Kelman's proffer of clear and convincing evidence of CNA's bad faith includes the following: First, CNA's stated reasons set forth in its June 14, 2011 letter were at a minimum unclear, and at worst, were intentionally vague in violation of Pennsylvania insurance law. Kelman's Brief in Opposition, doc. no. 182, p. 2. Second, within a month of the March 17, 2011 breakdown, CNA's adjuster (Goewey), CNA's retained engineering expert (Bizzak), a CNA risk control specialist, and a CNA subrogation specialist all "concluded that the "breakdown" was "sudden and accidental" – a term of art which should have triggered coverage, not a denial of coverage. Id., pp. 2-3.

### a. Denial Letter - Unclear or Intentionally Vague

Starting with Kelman's first premise, Kelman's First Amended Third Party Complaint (doc. no. 149) suggests that CNA's June 14, 2011 letter violates various portions of Pennsylvania's Unfair Claims Practices Act or Pennsylvania's Unfair Insurance Practices Act ("UIPA," 40 Pa.C.S.A. §1171.1 *et seq*.). Doc. no. 149, ¶¶ 36, 42, 64. As a threshold matter, this Court notes that there is "no private right of action under the UIPA, which can only be enforced by the state insurance commissioner." *Leach v. Northwestern Mut. Ins. Co.,* 262 Fed.Appx. 455, 459 (3d Cir. 2008) citing, *D'Ambrosio v. Penn. Nat'l Mut. Cas. Ins. Co.*, 431 A.2d 966, 970 (1981). Thus, insofar as Kelman's claim for bad faith is predicated upon an alleged violation of the UIPA, it must fail as a matter of law.

To the extent that Kelman attempts to use the denial letter as evidence of bad faith because it is "at a minimum unclear, and at worst, . . . intentionally vague[,]" the Court disagrees.

As noted above, the denial letter clearly states the reasons CNA denied coverage. The letter begins by detailing Bizzak's findings and conclusions:

> Your client explained that on March 15, 2011 they were in the process of producing bottles when a water line was damaged by the molten glass. This caused a drop in temperature and this caused the glass to cool and push upward. In this case the glass was pushed out of a hole in the furnace and approximately 120 gallons of molten glass spilled.

> We then contacted engineer Dave Bizzak with Romuladi Davidson & Associates and requested that he meet with your client and verify the cause of loss. Mr. Bizzak met with your client and verified the facts of the loss with him. He determined the loss did not occur as a result of operator error or the specific failure of a component of the furnace and/or its associated controls. The leak that occurred near the surface is not uncommon. Molten glass can leak during glass color changeovers when temperature disturbances within the furnace occur. The subject leak occurred at a location that allowed the molten glass to flow over one of the cooling lines of one of the electrodes. As a result there was a loss of this cooling electrode and molten glass began to flow out of the casing of the electrode and the cooling jacket annulus. This resulted in a flow of molten glass from three separate leak pathways and the amount was too great for cooling or water lances to stop. Thus there was a significant volume of molten glass that escaped from the furnace.

After providing this information, CNA explained that its policy provided coverage in the event of a breakdown, and then provided the correct definition of the policy term "breakdown" as follows:

> 1. "Breakdown":
>
>> a.   Means sudden and accidental direct physical loss to "Covered Equipment," which manifests itself by physical damage, necessitating its repair or replacement, unless such loss is otherwise excluded within this Coverage Form.
>>
>> b.   Does not mean or include:
>>
>>> (1) Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;
>>>
>>> (2) Defects, erasures, errors, limitations or viruses in computer equipment and programs including the inability

to recognize and process any date or time to provide instructions to "Covered Equipment";

(3) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

(4) Damage to any vacuum tube, gas tube, or brush;

(5) Damage to any structure or foundation supporting the "Covered Equipment" or any of its parts;

(6) The functioning of any safety or protective device; or

(7) The cracking of any part on an internal combustion gas turbine exposed to the products of combustion.

Finally CNA concluded the letter as follows:

Continental Casualty Company will be unable to compensate you for this loss as there was not a "breakdown" as required per the above-cited policy language.

Doc. No. 175-15, Ex. 85, pp. 72-75.

Given the detailed content of this letter and the step-by-step analysis set forth in the letter, the letter fails to provide Kelman with the requisite "clear and convincing evidence" that CNA was either intentionally vague or unclear as to its reasons for a denial. What is clear is that Kelman disagrees with CNA's position that the episode that took place on March 15, 2011 was not a "breakdown." CNA's letter states that per Bizzak, "The leak that occurred near the surface is not uncommon. . . . The subject leak occurred at a location that allowed the molten glass to flow over one of the cooling lines of one of the electrodes." The letter then notes that "breakdown" does not mean "[l]eakage at any valve, fitting, shaft seal, gland packing, joint, or connection[.]"

Given the language set forth in the denial letter itself, the Court concludes that there is no genuine issue of material fact suggesting that this letter was intentionally vague or unclear.

### b. "Sudden and Accidental"

The Court now turns to Kelman's second premise that Goewey, Bizzak, a risk control specialist from CNA, and a CNA subrogation specialist all concluded within one day to one month after the incident that Kelman's loss was "sudden and accidental," thereby requiring CNA to provide coverage (not deny coverage).   The Court likewise concludes that there is no genuine issue of material fact to preclude ruling CNA's favor.

It is undisputed that Goewey and Bizzak had an oral conversation on March 18, 2011 – three days after the incident at the Kelman plant.  It is likewise undisputed that following this oral discussion, Goewey wrote the following in his claim notes: "[B]ased on the facts described to him [Bizzak] this was definitely an occurrence that was sudden and accidental."  Kelman's Brief in Opposition, doc. no. 182, p. 2; see also, doc. no. 175-12, exhibit 94, pp. 41-42.

The Court notes that this particular claim note is lengthy and that the author (Goewey) wrote the note based on an oral discussion with Bizzak; thus, Goewey put in his own words what Bizzak told him over the phone.  Kelman admits that Bizzak testified that he would not have used the terms "sudden and accidental," when orally explaining (on March 18, 2011) to Goewey what occurred at the Kelman plant on March 15, 2011.  Id.  Per Bizzak's testimony, he would have explained what happened during the incident on March 15, 2011, and he would have explained why the leak was "out of the realm of normal."  Id.

Despite Goewey's characterization of what Bizzak told him on March 18, 2011, Bizzak's report (dated March 24, 2011) stated in pertinent as follows:

> Review of the furnace logs revealed no significant temperature excursions that would indicate that the initial leak out the furnace was caused by operational error or by a failure or malfunction of the furnace controls or associated components. Moreover, evidence of a leak just below the surface of the molten glass, as evidenced by the breach in this area and the observed physical damage to the cooling line to the electrode, indicate

that initial leakage of molten glass occurred through this pathway. Such leakage, especially during a glass color change, is reportedly not uncommon. Even if such a leak were not sealed by cooling of the glass as it flows outward and contacted the outer refractory lining, leakage would normally be readily controlled by manually cooling the molten glass using a water lance. Evidence of previous occurrences of similar such leakage was observed in various locations on the exterior north wall of the furnace.

The report then concluded as follows:

Based upon my review and analysis of available evidence, it is my opinion, within a reasonable degree of engineering certainty, that the March 15, 2011 incident at Kelman Bottles Glenshaw facility did not occur as a result of operator error or the specific failure of a component of the furnace and/or its associated controls. On the contrary, the initial leak below the top of the molten glass was not uncommon either in its occurrence or location. That is, Mr. Hogan [Kelman's plant manager] indicated that leaks near the surface of the molten glass within the furnace, although not frequent, can occur during glass color changeovers when temperature disturbances within the furnace occur. While such leaks are either self-sealing due to cooling of the escaping glass (very small leaks) or are manually arrested by cooling the glass with water lances, the subject leak occurred at a location that permitted molten glass to flow onto the cooling line of one of the electrodes. As a result of the loss of cooling to the electrode, molten glass began to flow out the casing of the electrode and the cooling jacket annulus. The resulting flow of molten glass out of three separate leakage pathways was too great to allow the flow to be sealed by cooling the glass using one or more water lances. Consequently, a significant volume of molten glass escaped the furnace before employees were able to arrest the flow.

Doc. no. 175-11, Ex. 60, pp. 19-20.

The report, which was indisputably provided to Kelman, does not provide Kelman with the requisite clear and convincing evidence to suggest that the "breakdown" was "sudden and accidental" and thus, covered by the policy. To contrary, the report is replete with references such as "previous occurrences of similar such leakage was observed in various locations on the exterior north wall" and "leakage . . . is reportedly not uncommon."

Simply put, the Bizzak report, which was published after Goewey and Bizzak spoke on the telephone, contradicts what Goewey placed in his note. The Bizzak report provides a basis upon which CNA could reasonably disclaim coverage. The Bizzak report is a written document

prepared by the engineering expert who was on-site to investigate the loss one day after the occurrence and thus, is a more reliable document upon which a carrier may base a decision to provide or disclaim coverage, as opposed to an adjuster's claim note predicated upon hearsay.

Although the Court acknowledges that Kelman may be technically correct that Goewey's claim note referenced above contradicts CNA's position that the breakdown was ***not*** sudden and accidental, this "contradiction" is of no moment for the following reasons: (1) the claim note was Goewey's interpretation/characterization of what Bizzak told him orally during a telephone conversation, (2) Bizzak's testimony that he would not have used the terms "sudden and accidental" during that conversation, and (3) the statements and conclusions set forth in Bizzak's written report clearly contradict a "sudden and accidental" finding. Accordingly, Goewey's singular claim note does not provide clear and convincing evidence that CNA engaged in bad faith with respect to Kelman's March 15, 2011 claim.

## 2. CNA's Claims Handling

Kelman next argues that the way in which CNA handled its claim constitutes bad faith. Although Kelman, in its Amended Third Party Complaint bases its "claims handling" bad faith claim primarily upon CNA's alleged violation of the Unfair Insurance Practices Act ("UIPA") (40 Pa.C.S.A. §1171.1 *et seq*.) and the regulations governing the UIPA (31 Pa. Code §146.1 *et seq*.),[6] its Brief in Opposition to CNA's Motion for Partial Summary Judgment does not. In its Brief in Opposition, Kelman claims that the following facts create a basis for its bad faith claim: (1) Goewey misrepresented CNA's policy language – specifically how "breakdown" was defined and adjusted the claim based on the wrong definition; (2) CNA's letters during April, May, and

---

[6] Again, as noted above, there is no private right of action under the UIPA, which can only be enforced by the state insurance commissioner. *Leach v. Northwestern Mut. Ins. Co.*, 262 Fed.Appx. 455, 459 (3d Cir. 2008), citing *D'Ambrosio v. Penn. Nat'l Mut. Cas. Ins. Co.*, 494 Pa. 501, 431 A.2d 966, 970 (1981). Thus, a claim for bad faith cannot be solely predicated upon an alleged violation of the UIPA. *Id.*

June of 2011 suggested CNA was investigating the claim, but CNA was not; and (3) CNA refused to provide any further explanation and factual support for its June 14, 2011 denial of coverage. Doc. no. 182, pp. 4-8.

CNA, in its Reply Brief, countered that no evidence exists to show that Goewey intentionally misrepresented how "breakdown" was defined when he issued the ROR letter. Kelman has produced no evidence that Goewey did so with any ill will or intent. The lack of evidence renders the misquoted definition a simple mistake, (as Goewey and his supervisor both testified), especially in light of the fact that Goewey provided a copy of Kelman's CNA policy (which contained the correct definition of "Breakdown") to Kelman on April 7, 2011, and also used the correct definition of "breakdown" in the June 14, 2011 denial letter. Thus, the above does not constitute bad faith as the term has been defined by Pennsylvania law.

Next, the three form letters CNA sent to Kelman in between the date of its oral denial of coverage (March 23, 2011) and its written denial of coverage (June 14, 2011), likewise do not constitute bad faith. As admitted by Kelman, CNA notified U.S. Fire and Kelman on the same day that it would be denying coverage and then proceeded to monitor the status of U.S. Fire's investigation of the claim. This Court does not find that CNA's oral notification to Kelman that a denial of coverage was imminent, nor CNA's delay in issuing its written denial of coverage, all the while monitoring the investigation of another insurance company, constitutes "bad faith" as defined by Pennsylvania law.

Kelman presents no evidence as to how CNA's delay between its oral and written denials illustrate CNA's breach of a known duty (*i.e.,* the duty of good faith and fair dealing) to Kelman through a motive of self-interest or ill will. CNA's delay in issuing a written denial, and its decision to issue three letters essentially indicating its investigation was <u>not</u> concluded, all the

while it was monitoring U.S. Fire's investigation of the same occurrence, does not constitute "bad faith."

Last, CNA's alleged refusal to supply Kelman with the additional information it sought following the issuance of CNA's denial letter also fails to rise to the level of bad faith. CNA did not ignore Kelman's request for additional information. Rather, CNA directed Kelman back to the CNA June 14, 2011 denial letter for the answers Kelman sought. Furthermore, as noted above, although Pennsylvania bad faith law extends to an insurer's conduct in handling the claim, that conduct must "import a dishonest purpose." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa.Super.Ct. 2004). Here, there is no evidence that CNA's alleged refusal to provide Kelman with additional information outside of what was contained in the denial letter was done with a dishonest purpose. Again, it appears to this Court that Kelman and CNA simply disagree whether Kelman was entitled to coverage under the CNA policy – an appropriate dispute for a breach of contract claim (which is still a viable claim in this case), not a bad faith claim.


## IV. CONCLUSIONS

In order to prevail on a claim for bad faith, Kelman must prove by clear and convincing evidence: (1) that CNA did not have a reasonable basis for denying benefits under the policy; and (2) that CNA knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.

The Court finds that no genuine issue of material fact exists concerning whether CNA had a reasonable basis to deny coverage to Kelman, and thus, because CNA had a reasonable basis to deny the claim, Kelman cannot meet the first prong the bad faith test. As such, the Court need not consider the second prong of this two-part test.

After thoroughly reviewing the evidence presented by the parties, and after examining the evidence in the light most favorable to Kelman, the Court finds that there is no factual dispute which is both material and genuine such that Kelman could sustain a cause of action for bad faith against CNA.  Accordingly, the Court will grant CNA's Motion for Partial Summary Judgment in this regard and will dismiss the bad faith claim (count two of Kelman's First Amended Third Party Complaint).

The remainder of CNA's Motion for Partial Summary Judgment attempts to limit Kelman's damages on its breach of contract claim against CNA.  The Court concludes that these arguments are more properly brought as Motion(s) *in Limine.*  Accordingly, the Court will deny CNA's Motion for Partial Summary Judgment in all other respects.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge